Case number 16-2102, Amanda Sumpter v. Wayne County et al. All arguments not to exceed 15 minutes per side. Mr. Michael Desi for Plaintiff Appellant. Good morning, Your Honors. Michael Desi on behalf of the Appellant. Your Honor, if I may, I'd like to reserve three minutes for rebuttal. May it please the Court, Your Honors, this is a case that alleges unlawful and unreasonable strip searches being conducted at the Wayne County Jail by a number of female inmates. And Ms. Sumpter, who I represent and is my client, brought these claims on behalf of a putative class seeking to hold Wayne County responsible both for its policy and customs under a Monell theory, and she also brought individual claims against an individual officer by the name of Defendant Deputy Graham. I'd like to start with the qualified immunity question. I guess the easiest way to say it would be, if you ask the wrong question, you get the wrong answer. And in my estimation, that is what the District Court did in this instance. The District Court simply found that there was no clearly established law that would entitle my client to a strip search in private by a member of the same sex. The U.S. Supreme Court's been pretty clear lately about being careful in talking about clearly established law, not jumping too high in the ladder of abstraction here. And so what is the clearly established law when you have group strip searches and you have a legitimate reason, or at least they offer this particular reason? What's the case that says this reason, getting people to medical screening promptly, doesn't suffice? Well, Your Honor, the clearly established law is that if you conduct group strip searches, it can only be where others would have a particularized need, or there would be a circumstance in which these other passerbys or inmates or male guards would have a reason to see the female inmates in a state of undress. That's the clearly established law. But more importantly in this case, we have a whole host of allegations about the unprofessional conduct in nature. Focus on the group searches point. Sure. What's the? Well, I cite. Do you agree with me that the rule is this? Normally no group searches, but you can't have group searches if you have a legitimate reason. That's the rule. I agree with that. So what's the case that says getting people promptly to medical screening is not a legitimate justification? Well, there isn't a case that says that a prompt medical screening. But in this instance, it's not just medical screenings. It's every time an inmate goes in or out of the jail, they're subjected to these strip searches. So whether they have a visit by a family member, whether they go to court, or whether they go to a medical screening. But the more important aspect of the allegation, in my opinion, is that these group strip searches were occurring in a room where these women were naked. A lot of these girls were on their menstrual cycles. There was bodily discharges on the floors. The girls said that there was blood on the floors. They were made to bend and cough, and there were bodily fluids discharging from the women, and they were all in close proximity. They could see each other. So I don't believe you can just separate out the fact that it's a group strip search. There's also the conditions under which it's occurring. Now, in two opinions in this court, and two opinions that have been issued by this court, both the Studemeier opinion and then also the opinion of Williams v. City of Cleveland, which Judges Griffin and Judges Clay were on that panel. In the Williams v. City of Cleveland case, this court made it clear, and Judge Griffin wrote that opinion, that conducting strip searches in the presence of other people who don't have a need to see them is unconstitutional. Now, I understand your point, Your Honor, which is, well, maybe there's an instance in which this was reasonable because they had to do it that way. But I don't think you can separate that out from the manner in which this was occurring. They were calling these girls bleeding hogs. They were saying, take your clothes off. I don't care if you're bleeding like a hog. I don't think there's any circumstances in which that could be envisioned to pass any clearly established law. And the Sixth Circuit's precedence is that if the law is clearly established, the general contours of constitutional law are clearly established, then you can rely on the general contours. In both the Williams case and in the Studemeier case, this court tracked the law back to, and even citing a 2001 case from the Fourth Circuit, the Amici v. West case, saying you have to have a reason why these other people, passerbys, whether it be other inmates or passerbys, have a reason to see these girls or these inmates in a state of untress. But when you look at the totality of how these searches were being conducted, I don't think we can reach the conclusion that they had a reasonable justification for doing it this way. And the other point that I would make in response to Your Honor's question is, they implemented a policy that said, okay, we're going to start doing it in private. So that would prove the point that they were able to do it in private. Now, there's also record evidence that shows that the – I think my clients – Well, I agree. It could cut against the claims. But my clients are bringing claims that occurred since 2009, well before the defendant claims to have voluntarily ceased its practice. Now, I've also offered record evidence which shows that the voluntary cessation is also challenged. I have affidavits from inmates who said that they were strip searched after Wayne County implemented the policy change to say, okay, we're going to do these in private now out of the presence of other people. So my problem with how the district court handled this is he ignored all of the unprofessional comments, asking these girls how big their breasts were, commenting on their sexual orientation. This is repulsive. It's repulsive and it doesn't pass any constitutional standard for what should be deemed reasonable under the circumstances. Can I ask you – so I've given you a chance to respond to my clearly established point, and I think you're focusing on the facts, but you understand my concern and you can deal with it how you wish. My second concern relates to the claims about men watching. So I would call those claims against male officers, like what are they doing there, why are they doing this. And what's strange about the way the case came to us is we don't know the identities of any of these male officers. Normally when you have a policy or failure to train case, it has two pieces to it. You've got a claim against an individual officer. You have a claim about – it's usually a qualified immunity setting, but there's a constitutional violation by that officer. And then on top of it you have the Monell claim. So that's usually the way these cases come. That's not required, but what's odd to me about it is that we don't have the names of any of the officers as I understand it. So that's a little bit of a complaint by me, but I also have a suggestion. Why don't we – isn't that the point of exhaustion? Why wouldn't we allow the plaintiffs, your clients, to use the administrative procedures in the grievance process with the prison to try to figure out who these officers were, which just seems like it would put the case in a much better setting for resolution.  First, my client was not incarcerated, so the Prison Litigation Reform Act does not apply, period, in the case. I thought this was a class action. It's a class action brought by a plaintiff who's not incarcerated. Now that question was never answered or ever addressed by the district court, but there is case law which suggests the PLRA only attaches to the named plaintiff. If the named plaintiff is not incarcerated – For what it's worth, this is supposed to help you. You can treat it as a hostile question, but it's very strange not to have the identities of the misbehaving officers because it puts the prison in a funny position. They're supposed to say, well, there were 100 employees at the time. We're supposed to show that not any one of them did this? Well, here's the problem, your honor. These ladies are – they're being strip searched in a ward, and these are like two-way windows with sort of a discolor – a dark tint on the window. So the men would come into the ward. They would begin strip searches, and then the women deputies would say, okay, the men, you step out. They would step out, and they would be on the other side of the windows. So my client has said, the men were in there. Now, can she identify who the person is? No, and she wasn't incarcerated, so there never was any grievance issue because she didn't have to file any grievances or comply with any provisions of the PLRA. But the same thing with a lot of these girls. If they're in this room – I'm not – at this point, I'm not making a technical point. I'm just saying it's always a good idea to know who the misbehaving people are, so why not use discovery at a minimum to say, okay, this is when I was processed. Who were the guards on – male guards on duty? Well, this is what we have in discovery. Number one, discovery wasn't complete, but number two, this is what discovery tells us. We have these reports of strip searches. Do you want to complete discovery? I'm sorry? Would you like to complete discovery? Well, I believe it would add clarity to this particular question, but there are reports that show there were, let's say, eight officers that were involved in the strip search. Now, which of the eight were in there in the bubbles on the other side of the walls, we don't know. But we know that all of the girls, or at least a handful of the girls that were in the room, according to the strip search report, they all testified by affidavit to the same facts. They said, hey, these guys were standing here watching us. We were all naked, lined up, and the male guards simply went outside. Now, can they give a name to those male guards? No. They're standing here naked. They're trying to cover themselves, and there's a wall in these windows in which they can see through them. My client said, look, I'm certain the male deputies were standing there. I could see their silhouettes. We could hear their voices. Often, many of these women testified that these men would laugh at them. They'd mock their bodies. They'd make comments about them. And I offered 300 affidavits, 155 of which these women said, these men were looking at us. I could see the men. They were there. Some of them said they touched them. But regardless of the differentiations between the women's affidavits, 155 of the women said the men were present. They could see us when we were naked. Now, this court held way back in the 1980s in the Cornwall case that the forcible exposure of inmates to members of the opposite sex states a valid constitutional claim. It's the same O'Neill claim that we have here. The city of Canton says you don't have to name an individual. If I'm not able to identify the individual, I don't believe I should be faulted for that. If the municipality itself is responsible for the policy and the custom, which is what I'm alleging, then we should proceed with the O'Neill claim. But for the district court to simply say there's only one instance, it's just absurd. There's 300 affidavits of all of these different derogatory comments, these women talking about. One of them said, I could feel her breath on my vagina. These are repulsive, repulsive instances of what's going on. And the district court simply ignored that and said, well, there's only one instance of my client. My client only testified to one instance. Well, that might be true. But she's certainly entitled to marshal all of the other evidence before the court in response to the summary judgment on the O'Neill claim. Now, it may be that we'll learn the specific identities of who may have been standing out there later, but we may not. But in either event, I don't believe that that is something that precludes my client's claims in the least. So City of Canton is the case you mentioned. That says you just don't need to identify individuals. And I realize you can bring John Doe claims, but that's not what you've tried to do, right? No, I didn't bring John Doe claims. You're right. And City of Canton says that you can still recognize a municipality liability even without naming a particular individual defendant. And there's other circuits that have followed that, and I've cited that on page 10 of my reply brief. It cites the different cases in court that have said – I get the idea you don't have to name them as defendants, but how about identify individuals doing something improperly? Well, we've identified that the men were out there. The fact that we can't identify the specific name and we don't name them as individuals I don't believe is any procedural defect of my client's claims. So City of Canton is your case for saying that. Well, City of Canton, I cite that, and I also have a First Circuit case, Wilson v. Town of Mendon, which the court said there's nothing to prevent a plaintiff from foregoing the naming of an individual officer as a defendant and proceeding directly to trial against the municipality. Same thing in the Fifth Circuit in Peterson v. City of Fort Worth. These are cases which hold that you can proceed on the municipality claim. So just – you've read the cases. I haven't read those cases. Just to be clear what I'm saying, I get the idea they don't have to be named as defendants. Are you saying in those cases it also didn't matter to the court that the plaintiff couldn't identify who the individuals were implementing the unconstitutional policy? That's the question. I do see that my time is up if the court would like me to answer the question. Certainly. Go ahead. Your Honor, those cases essentially what they say is that you can pursue the Monell claim without naming the individual person who is the culprit. But if the crux of the claim is that the municipality, they fostered this policy or custom, that's what we're claiming is that Wayne County was allowing these men to stand around, gawk at the women, mock them, make comments about them. It doesn't matter if you name one, two, three, ten of the men that may have been standing out there. Wayne County was allowing it to continue unabated. And that's essentially the answer that I have for Your Honor's question, and I believe that those cases support it. I have just a couple questions. Is your client seeking monetary damages? She's seeking monetary damages as well as injunctive and declaratory relief. I thought in her deposition she disclaimed any claim of monetary damages. Her complaint states that she's seeking monetary damages. So there may be a question about whether she wants something personally, but she's still entitled to prosecute the class claims. And if there's an award of punitive damages against the defendants, whether she wants any particular part of that or not, she's still seeking punitive damages, which is pled in her complaint. And the district judge recognized that the policy had changed. And your Monell claim is what premised on the fact that it has not really changed? Well, my Monell claim was premised on it was happening before, leading up to the alleged voluntary cessation. Now, Wayne County says they voluntarily ceased the practice of the group strip searches in late 2013. I did file affidavits, and I offered affidavits of several inmates who said, hey, this happened to me in 2014. I was group strip searched in 2014 after a couple of years. The judge also said you don't have standing to assert the prior policy because your client is no longer pretrial. As to the injunctive relief, the district court found that my client's claims were moot. But mootness is different from standing. The Supreme Court told us in Friends of the Earth that you can't confuse the doctrine of mootness with standing. Mootness is not simply standing frozen in time. Otherwise, you would never have the exception of capable of repetition yet evading review. So that's the exception you rely on? That's right. That's right. And those are the Supreme Court cases that I've cited. Thank you. Thank you, Your Honors. We'll hear from Happily's Counsel. Good morning, Your Honors. Davide Stella on behalf of Corporal Terry Graham, Sheriff Benny Napoleon, and Wayne County. Your Honors, I know this has been fully briefed, and I think I probably won't do a good a job as up here as I would in writing on a lot of these issues. But I want to make the point that at this point of the case, we're only dealing with Amanda Sumter's claim. We're not dealing with the class claims. We're dealing with what happened to Amanda Sumter. And so what happened to Amanda Sumter is not what a lot of the affiants at Huron Valley MDOC facility have said. Amanda Sumter was strip searched three times routinely. Inmates are strip searched coming in and out of the jail, so when you go to court, when you transfer facilities, things like that. Whenever you're outside a facility, you have to get strip searched coming back in. The evidence in this case is that although Wayne County didn't officially sanction the practice by Corporal Terry Graham, Terry Graham testifies, and there's nothing really to refute this, is that the norm was an individual strip search. And the only reason more than one was done was because of volume. Now, Wayne County is the busiest, largest jail in Michigan. Let me answer something on that. If the claim is that the strip searches had to be expedited for purposes of efficiency and time, why wasn't it done in such a way that those who were scheduled for some sort of subsequent medical evaluation, that those searches were done first, that those would be expedited, not that everybody would be strip searched in this huge group of people without regard to the scheduling of the individual inmates? Why not expedite the ones that were in urgent need of medical evaluation or whatever needed to be done? Why throw everybody into the pot? Well, Your Honor, that's a good question. Well, the vast majority of people that are strip searched, so again, the two major groups of people are people coming into the jail for the first time, so they're coming in from court or off the street or something like that, or you have people coming back from court. So that's the two main group of people. So everybody who comes into the jail is medically screened, everyone, no matter whether you have an urgent apparent need or you have not an urgent apparent need. So the idea is that when volume is high on a particular day or particular time of the year, the idea is that everybody in what they call the bullpen, bullpen waiting to get strip searched, has to see medical, regardless of the severity. I mean, for example, if an inmate needed immediate medical attention, they'd go to the hospital immediately. But when people are coming in for the first time, that is probably the most important time you have to strip search them. And we can't let inmates into the facility with any sort of outside contraband or things that are banned in the jail, because they have to get cleared and then they go up to medical, because medical is a part of a different floor of the same facility. There was an indication in the record that there was another shift coming up, that some could have been deferred to the next shift if needed, but the people who urgently needed to go could have been done right away and the others could have been done in an ordinary course. Well, I don't know if Corporal Terry Graham, you know, is qualified to maybe necessarily evaluate who needs to go now. I mean, I don't know who makes that call about who needs to get impressingly medically screened or as opposed to like. Well, some would say that they did. Some would manifest symptoms. Some would have prescriptions that needed to be filled. There's a way to differentiate, I would imagine.  Isn't that what you're doing now with the change policy? Obviously someone is deciding that this person needs to be searched more quickly, because they obviously need medical screening right away. Well, that's actually not what's happening. What's happening is that since the policy was changed, you know, Corporal Terry Graham is not the only person who does it. There's other shifts and other people. So she's just being sort of singled out of the staff of people who do it. But what's happening now is that they're trying to do individual ones, right, and it's causing massive, massive backups. It's just like so people, instead of waiting in the bullpen half hour, 45 minutes, they're waiting there all day sometimes, you know, when volume is high. So when Corporal Terry Graham has 40 people on a day to do, you know, they just do one at a time. You know, people come in at 8. They don't get up to medical until late in the afternoon, you know. For the record, it's not clear as to all that, how long various people had to wait. There's just this general assertion that everybody needed to be expedited. Well, I think it's in Corporal Graham's affidavit or it's in her death testimony. I could find you the site if you needed it. But she testifies, since she's still doing it today, she testifies that the way, you know, as a result of the policy change, it's just taking way, way, way longer to get people into the jail. So, like, again, I mean, I don't know. I can't remember if she had a specific example of this inmate or in this inmate. But the idea is that, you know, when there's high volume, the only reason why you do it in groups is there's high volume. Because low volume is one at a time. That's the default. Or you may be doing it because the jail hasn't allocated sufficient personnel to organize the searches properly. Well, I mean, I don't know about that. But, I mean, the idea is that the way it's set. I mean, Corporal Terry Graham wouldn't be necessarily responsible for how the jail sets it up. So if we're talking about her, if the jail is somehow the facility or the building or something like that is inadequate, I don't know if we can impute that to Corporal Terry Graham because she just works there. She just shows up to work every day. I mean, she has to work within the confines of the way the facility is set up and our volumes. And, you know, there might be an issue of, you know, Wayne County Jail doesn't have enough money in general. But that hasn't really been in the record of this case or shown to impact anything in particular. So one of the things you complain about with the Monell claim is that the misbehaving male officers have not been identified. Yes. Why wouldn't it be appropriate to send the case back to the district court and then through some form of administrative exhaustion go back to try to figure out through the internal grievance process who these officers were? Well, Your Honor, the first point is that we have found no grievance at all filed by any Wayne County inmate above the strip searches. So we had a prior case, the Janine Weathington case that we talked about in our brief. I call this a grievance for what it's worth. I'll call this a grievance. All right. I'm pretty confident she's not going to have a problem filing a grievance. I'm just trying to you're raising, I think, a fair point. What are the names of these people? Why not try to use a process that can figure out who these people are? Usually the state doesn't oppose exhaustion. Well, Your Honor, I forgot what I was going to say in probably a more direct response to what you're asking. Discovery is long over, long, long over in this case. It's not like we pulled the trigger. All this was filed after discovery was long completed. And we turned over the names of every male who worked on the floor, every male deputy worked on the general floor that day. And it was a pool of people. I can't remember how many it were. It might have been 8 or 10 or 12. It was some group of people. Now, I don't know if, obviously, the Wayne County Jail is kind of a difficult architecture to explain. So you have almost like a, you have wards on four corners, which are L-shaped, running along the walls. And then you have a center part of the floor where a lot of the deputies do paperwork and things like that. So only the people on those L's in the corner can see into the ward. But everybody who's working on the inside cannot. So the way the official Wayne County Jail policy is, is that when strip searches are done, they are done by female officers. They are announced that they are doing them. And any males that would be on the floor, like we try to staff the female floor with only female deputies. But given staffing shortages, sometimes you need male deputies on the floor. So when those strip searches are done, all the males go into the center office area where it's impossible to see what's going on in the ward. I know the policy is gloriously constitutional, but the point of all these affidavits is that that's not what they're doing. Well, I mean, Your Honor, again, in our brief, I guess the main point, why this is kind of catching me by surprise on appeal, is that this wasn't argued below. Only the affidavits were linked to the registry search. They were linked to Terry Graham. They were not linked to the floor search. Let me ask you this, since you say discovery is long over. Did you do any, did you depose any of the inmates who rendered the 300 affidavits in order to test the veracity of their allegations? No, we did not. And, you know, the affidavits were mostly collected by Jeanine Webbington in a prior case. So all the inmates are all here on Valley. They're all from the same facility. But, of course, you could have deposed those people if you were concerned about the veracity of those allegations. Well, I mean, I guess we could have deposed. I mean, the idea is that there's so many and they say so many different things. Well, you wouldn't have deposed all of them, but you didn't depose any of them. We did not depose any of them. All right. But, I mean, like I said, you know, these affidavits weren't something that, you know, these affidavits were collected by an inmate at the jail in connection with a prior case and recycled and reused in this case. It's just nothing to do with anything. If they're relevant, they're relevant. Yeah, I mean, like I said, we're only talking about Amanda Sumter right now. No class has been certified, you know. So to the extent that other affidavits would be relevant, it would be relevant to a Monell claim, you know. And so I don't know, since we didn't argue this below and briefed it below, I don't know of those 300 which numbers are going to the cell block search. So give me the names of the people who are supporting Amanda Sumter's allegation that there were men on a cell block search. Then that kind of narrows it down. But when the 300 affidavits or, you know, however many there were, were offered only on this issue. If you look at the summary judgment briefs, you can see how this argument plays out. It plays out that we're talking that the affidavits were offered to talk about Terry Graham. They weren't talking about this anonymous male on the cell block floor. So, you know, if we had known that's the direction. Make sure I'm following you. You're saying the affidavits were used only for the individual officer claim and not for the Monell claim. Is that the point you're making? Yes. It's in our brief. I don't know what page on our brief. I'll show you the sites. We cite exactly in the brief where we raise the argument and where the plaintiff comes back and responds to it. So I thought that these affidavits were going in this direction. And now these affidavits seem to be now, you know, relevant to some other claim. And so, like I said, if I were aware. Let's say they had preserved this, just to use your time productively. What do we do with the affidavits when it comes to the Monell claim? Because what the force of them seems to be, well, yes, you had a constitutional policy in name and in language. But it wasn't being followed. Proof, see affidavits. Let's assume they preserved that argument. What do we do with that? I mean, like I said, for me to defend the case, for our office to defend this case, we need to know who from Huron Valley, what current MDOC inmate recruited by Janine Webbington in a prior case is going to testify on this Monell issue. So in response to Judge Clay's question, at that point, I'll say maybe I'll take a trip to Ypsilanti, Michigan, and depose some of these people. But that's not where the argument went. I thought below, we're heading into these affidavits because we're focused on Terry Graham, and his cell block search is like another argument, but not the primary argument. You're answering my question by saying it was forfeited. And I said, assume it wasn't forfeited. Assume below they said what they're saying now. Hey, these affidavits prove that men were watching the female strip searches all the time. And that was not in conformance with the policy. Therefore, the policy by its terms wasn't being followed. And therefore, we can sue on Monell. Okay. I understand what you're saying, Your Honor. It's possible that if the connection were made, they would be relevant, for sure. For sure, perhaps, to show Monell claim. But, again, we're at the point where we're dealing with Sumter's claim. So Amanda Sumter was subject to one time on the cell block. No men participated in the search. She's saying that she saw through a blacked-out window male silhouettes. Our response is, Mr. Sumter, here is a list of everybody who worked on the floor. Tell me who it was. Or do something. Tell me. Do I need affidavits from all ten guys on the floor saying, nope, wasn't there, didn't watch her search? Is that my burden or is it her burden? She can't see if it's a silhouette. How is she supposed to know? Well, I mean, she can identify a tall person or maybe a round person or something. There's something identifiable feature. But I don't know how to defend it. We're defending a hypothetical. Ten affidavits that they weren't there doesn't seem that difficult, frankly. Well, you know, it's, I mean, I don't think it's necessarily that difficult. But it's not my case to prove. It's the plaintiff's case to prove. So, I mean, the idea is that she makes the allegation and then I have to prove the case instead of her proving that somebody was there, who it was. Now I have to, you know, I guess it kind of just reverses the traditional burden of proof in this case. I mean, and I just wanted to make a quick point on this injunctive relief. This is kind of a side issue, and I think that the issue is pretty clear that a plaintiff has to have a live claim when the case is filed to ask for injunctive relief. Okay? And to take advantage of Supreme Court cases like Gerritstein and Sozna, you can't say, well, this putative class behind me preserves like a moot claim that I myself can't bring. So, if you look at all those Supreme Court cases, that trio, all of those plaintiffs had a live injunctive claim. Like, I was being affected by this when I filed the case, but later circumstances happened and then sort of, you know, now my case became moot because I got released halfway through the case or, you know, et cetera. But, again, I don't think that now that we've discontinued the policy, and it's been discontinued for a long time, and Amanda Sumter wasn't incarcerated or affected by this policy when the case was filed, she can't use the claims of a putative class to sort of reignite that issue. So, unless the court has, I see my time is done. Are you arguing that the policy was not in fact changed? I mean, I did ask counsel for the other side, and what he did was he argued that, no, it's capable of repetition was the answer. But, is that an argument that even though there's a new policy, it's not really a new policy, it's really the same policy? Well, like I said, Amanda Sumter, if we talk about her in particular, she has no live claim for declaratory injunctive relief. I mean, that's not disputed. But, in terms of the policy not being discontinued. If that's not disputed, that's half the case that's gone. The other half is that her complaint does seek monetary damages, but when she was deposed, and they asked her about her damages, and asked her to specify what your damages are, she said, I don't want any damages. And so, is there not a damage claim here, too? I mean, it's, you know, she did make that admission, so I would say that at least for her, as a, you know. Well, that's qualified immunity. You're the one that's saying it's only about Sumter. Yeah, I mean, I agree. You're saying at least for her? At least for her. I mean, I would imagine that would be an issue. That's the other part of the case, then, isn't it? That's the case against individual officers. She's suing for damages. If she doesn't request damages, they're out, too. So, the non-claim would be out. The damage claim would be out because she doesn't seek damages. When they asked her, tell me what your damages are, I have none. I mean, isn't that the end of the case? I mean, I would think so. I mean, it was a curious admission for her to make, and she, in her deposition. Well, it's kind of an important admission, too, because they're allowed to inquire as to the extent of her damages. What damages do you have? How do you compute them? What do you ask for, this and that? Well, I don't ask for anything. Yeah, I mean, I think that is a completely legitimate observation about this case, and, you know, If her monetary claim is not going to exist, then how could she represent a class of people also seeking? I don't know how, at trial, she can ask for whatever damages she's going to ask for when she says, I don't really seek any damages, and, therefore, when you ask me under oath to detail my damages, I refuse to do so because I'm not going there. I don't want any. Yeah, I agree. I think that's a very important point. All right, I see that your red light is on. I guess, getting back to my Williams opinion, that obviously was a 12B6 motion, and our holding there was that it was a plausible claim and that there were no circumstances, interests by the jail that were even at issue, I guess, at the pleading stage. But do you think Williams creates any problems for you? No, I don't think so. I think one of the distinguishing factors of Williams, which makes a lot of sense to me, is that the actual touching is important. That the lousing agent was actually sprayed on people in embarrassing ways and that there could have been, at the pleading stage, maybe the jail in Cleveland could have figured out, well, why don't you put it on yourself? It seems to me like that is a completely reasonable way to look at it, but we don't have any touching or anything like that going on in this case. Thank you. Thank you. Your Honors, I'd like to address Judge Sutton's question about the forfeiture. Actually, I have this cited on page 12 of my reply brief, and I actually cite to my response to the summary judgment, and I say that the hundreds of affidavits of inmates testifying as the unreasonable manner of their strip searches, either in the registry room or in the presence of men or both, many of those affidavits detail. So it's clear, and I say here that I'm relying on those affidavits, so there's really no issue of forfeiture. And the fact that Wayne County is suggesting this in your reply brief here? It's in my reply brief here, but I'm citing to what I cited in the district court in my response to summary judgment. And the reason why, when Wayne County says, well, these affidavits are about the men, that really is not relevant. The way that they framed their summary judgment motion was that my client was only subjected to a single instance of being viewed by a man. And so by me citing these, what I was saying is, look, this is very, very elementary to see that there's 300 affidavits and nearly 1,000 pages that tell you in front of men, in front of men, in front of men, in front of men. That refuted the argument as it was framed by Wayne County as to the single instance. That was the argument that Wayne County was making, not that it wasn't happening or they disputed. They said, we don't think it happened anyway. And that factual dispute, in my opinion, also precludes summary judgment because that goes to the reasonableness of the search, if that's a factual dispute. And they are denying it. They said in their response to the summary judgment, we deny that that happened. So how can the court reach that issue in terms of a qualified immunity analysis or even the Monell analysis, for that matter? But I did cite to the affidavits both in response to the claim that men were watching the women as well as the searches and registry. The other thing is, Your Honor, Judge Sutton, your question about the medical call-outs and then the strip searches. These affidavits also make clear that these women were being strip searched, not just the women that were being called out for medical. So even if they had a legitimate reason for those inmates to get called out for medical to be strip searched, that doesn't address all the other hundreds of women who were saying they were being strip searched, going to and from court and having visits with family. So it's not just the medical. And the affidavits refute that point. Your Honor, I'm talking about the group strip searches. It wasn't that it was only happening if someone was going to a medical call-out. Even if there may be a legitimate reason for that, these women were getting strip searched. It wasn't just the women that were getting called out for medical. The crucial issue is regarding their interest, their excuse, if you were, that when the lines get too long, they have to deviate from their normal policy, which is individual strip searches. They have to go to group searches just because of the volume. But they changed that policy. So doesn't that prove the point that that wasn't a legitimate reason, that that was a pretext? Sounds like a remedial measure that's not even admissible in evidence. But I don't know. But did you refute their reason, their legitimate reason for having the group searches, that they say they only did it when the lines got so long that they had to do it for expediency? I refuted it, Your Honor, by arguing the same part and parcel that the unprofessional manner and the unsanitary conditions of the strip searches were all part and parcel of the reasonableness. And when the Supreme Court says in Bell you have to look at the overall reasonableness, I don't think you can extract that and then try to say, well, maybe the women that got called to medical had a reason. Just the other point that I want to make is Rule 23, the class certification rule, the commentary makes clear that there's an expediency requirement. And a lot of Your Honor's questions, they prove why that expediency requirement is important. Because if there were issues about this exhaustion or something, then that would have been the time to cure it. The district court has had this case for nearly four years and never took any of ruling on a motion for class certification under Rule 23. The rule says that the court shall expeditiously decide the motion. And the commentary says the reason you have to do that is because there might be issues with certain plaintiffs, there might be statute of limitations, there might be damage claims. And that's the time that that's supposed to get figured out. But that never happened because the court never ruled on the class certification motion, notwithstanding the fact that it had been pending for nearly four years before the district court. So a lot of Your Honor's questions, those things could have been addressed had the case been at least addressed in the certification motions at the district court, which never happened. And Your Honor, Judge Griffin asked the point about does it matter in the Williams case that this involved touching. Actually, Your Honor, the opinion makes clear that it involved two prongs, both the touching, the spraying of the dolousing agents on their body parts, but also the fact that it was being conducted in front of passerbys or other inmates who had no legitimate reason to see the other inmates naked. So that would be my answer to Your Honor's questions, if you have any other questions for me. I know your light's on there, but what was the history of the district court's handling of the class certification in terms of the motion, in terms of the delays and how the court dealt with that? Well, this case was preceded by the Weathington case, which was filed pro se. Ms. Weathington filed the case pro se. She filed the motion for certification pro se. Then I stepped in to represent her and I amended the motion. That motion was pending for nearly a year, and then it was administratively terminated by the district court. After that motion was terminated, Ms. Sumter then filed the instant case to stand in the shoes of the class to file the claim and to proceed on the class claims. Her motion was also pending for more than a year. The case was originally signed to Judge Levy, who had a status conference and also a hearing on the motion. Then for reasons that are completely unknown, after having the hearing and ordering additional briefing, after another six, seven-month delay, then the case was reassigned to Judge O'Meara. So between the Weathington case, the motion for class certification was pending for a year and a half, almost two years during the case, and then the Sumter case was almost another two years. So you now have almost four years of delay. Wayne County had all of these affidavits during all of those proceedings. So for them to try to claim that they didn't understand that these women were complaining about the men and what was happening, they had notice of it through four years of litigation and hundreds of affidavits that had been filed, both pro se as well as the ones that I had then filed in support of the motions, not just the motion for class certification, but also a motion for preliminary injunction, which was, again, never ruled on, notwithstanding the fact that these allegations continued to proceed unabated. And, Your Honor, Judge Griffin's question about, well, I'm just arguing the capable of repetition yet evading review. No, I'm arguing that they did not voluntarily cease. I have record evidence suggesting they continued doing it after the policy change. But my argument against the mootness is based on the capable of repetition yet evading review, which is the standard everybody knows from Roe v. Wade. A woman's not going to carry pregnancy for beyond nine months. So there's always going to be instances in which someone's going to have to litigate the claim after they may be in jail for only 30 days. So that's why those cases are applicable, and that's why the Supreme Court has found the capable of repetition yet evading review standard applicable to pretrial detainees like Ms. Sumter. All right. Thank you. Thank you, Your Honors. Case is submitted.